IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

LISA MOTEN,              )
                         )
     Plaintiff,          )
                         )
v.                       )     No.  **4:18CV-00106-JHM**
                         )
BROCK MEDICAL, LLC,      )
                         )     JURY REQUESTED
     Defendant.          )
                         )

## COMPLAINT

Comes Plaintiff Lisa Moten (hereafter, "Plaintiff"), by and through counsel, and, for her Complaint against Brock Medical, LLC, doing business as First Care Urgent Care Walk-in Clinc ("Defendant"), states as follows:

### Parties, Jurisdiction and Venue

1. Plaintiff is an individual residing in Hopkins County, Kentucky.

2. Defendant Brock Medical, LLC is a Kentucky limited liability company with a principal place of business at 1752 Hwy. 192 W., London, KY 40741.

3. Defendant may be served with process by service of process on its registered agent, Rob Pantoja, at the 1752 Hwy. 192 W., London, KY 40741, which is the registered agent and registered agent address Defendant has registered with the Kentucky Secretary of State.

4. Jurisdiction is proper under this Court because this case arises under federal law and, specifically, the Americans with Disabilities Act and the Americans with Disabilties Act Amendments Act of 2008, which laws are together referred to herein as the "ADA."

5. Venue is proper in this Court because the events that give rise to the causes of action in the case occurred in Henderson County, Kentucky and/or in connection with Plaintiff's

employment by Defendant to work in Henderson County, Kentucky; Henderson County, Kentucky is within the District of this Court.

**Facts**

6. Defendant Brock Medical, LLC operates an urgent care clinic under the assumed name First Care and the trade name First Care Urgent Care Walk-in Clinic at 230 N. Green St., Henderson, Kentucky (hereafter, the "Clinic"), which is within Henderson County, Kentucky.

7. Defendant employed Plaintiff to work as an x-ray technician at the clinic on or about January 31, 2017.

8. Defendant was aware when Plaintiff was hired that Plaintiff had had a stroke in September, 2016.

9. Plaintiff was employed to work "PRN," which meant "as-needed" and not assigned to a particular shift, but regularly worked at least three twelve-hours shifts per week, and, in fact, received overtime pay for working more than forty hours in a workweek in every pay period (Defendant was paid biweekly) after her first pay period.

10. Defendant worked at the Clinic from the date of her hiring until on or about June 9, 2017, which was her last day at work.

11. On or about June 13, 2017, Plaintiff was hospitalized for approximately one month for an emergency heart condition (cardiac afibrillation and adema). Plaintiff was subsequently again hospitalized on or about August 25, 2017 for approximately ten days and underwent numerous medical procedures, including open heart surgery to replace a heart valve with a mechanical heart valve and the installation of a pacemaker.

12. Plaintiff's heart conditions did at all relevant times constitute a disability, and substantially limited Plaintiff's ability to work and perform major life activities.

13. Plaintiff promptly communicated to Defendant her need for disability medical leave, and Defendant placed Plaintiff on unpaid leave.

14. Defendant was aware at all times that Plaintiff's heart condition constituted a disability, and substantially limited Plaintiff's ability to work and perform major life activities.

15. Plaintiff communicated with Defendant on numerous occasions during the period that Plaintiff was on leave to update Defendant about the status of Plaintiff's medical treatment.

16. Defendant never requested (A) that Plaintiff communicate with Defendant at any set intervals about Defendant's anticipated date to return to work (B) that Plaintiff provide Defendant with a fixed date when Plaintiff would be able to return to work or (C) that Plaintiff provide Defendant any information relating to her medical condition or to authorize her health care providers to provide documents or information to Defendant relating to her health condition or anticipated return to work. Had Defendant requested any of this information from Plaintiff, Plaintiff would have been able to provide Defendant with this information, and the amount of time that would have been anticipated by Plaintiff's health care providers (had Defendant requested that information, which it did not) at all times during her leave as the amount of time needed for Plaintiff to be able to recover and return to work was reasonable and would not have caused undue hardship to Defendant to accommodate.

17. Instead, when Plaintiff informed Defendant of Plaintiff's medical status and inquired on multiple occasions during her leave about the status of her employment, Defendant stated that she was fine, and requested that Plaintiff simply let Defendant know when Plaintiff received a letter from her doctor releasing Plaintiff to return to work.

18. During Plaintiff's inquiries, Plaintiff made clear that Plaintiff wanted to return to work after the conclusion of her need for leave, and that she was requesting that Defendant accommodate Plaintiff's need for leave for medical treatment for her disability.

19. Providing Defendant unpaid medical leave would at all times from when Plaintiff left work in June until she returned to Defendant in October have been a reasonable accommodation for Defendant to provide to Plaintiff to allow Plaintiff to return to work following her medical treatment for her disability.

20. Plaintiff's leave did not create (and accommodating Plaintiff's need for additional leave would not have created) an undue hardship on Defendant.

21. Specifically, Defendant had numerous employees at other locations, including locations in Madisonville, Kentucky and Hopkinsville, Kentucky, and did, and could have continued to, cover any "PRN" or "as-needed" shifts at the Clinic that Plaintiff would have worked using its other employees.

22. Defendant did not at any time engage in an interactive process with Plaintiff to enable Defendant to obtain relevant information to determine the feasibility of providing Plaintiff the leave Plaintiff requested as a reasonable accommodation for Plaintiff to obtain medical treatment for her disability without causing an undue hardship.

23. Indeed, until Plaintiff provided a letter to Defendant from Plaintiff's doctor releasing Plaintiff to return to work on October 12, 2017, Defendant's sole communication to Plaintiff about Plaintiff's medical condition and Plaintiff's employment was that Defendant requested that Plaintiff let Defendant know when Plaintiff had received a letter from her doctor releasing Plaintiff to return to work.

24. Defendant did not inform Plaintiff at any time prior to October 12, 2017 that Defendant considered Plaintiff's employment with Defendant to have been terminated.

25. On October 2, 2017, Plaintiff inquired by text message to her supervisor whether she still had a job with Defendant, and also informed Defendant that "I should know about being released by the 16th." Defendant's supervisor did not respond, which was not uncommon for her communication, and which Plaintiff therefore did not take as a sign that Plaintiff no longer had a job.

26. On October 11, 2017, Plaintiff left a letter with Defendant from her physician clearing Plaintiff to return to work. Because Plaintiff's supervisor was not present, Plaintiff also texted her that "I have been released from the doctor to come back to work. Yeah. I left the letter at the clinic for you." Plaintiff's supervisor did not respond to this text.

27. On October 14, 2017, Plaintiff sent another text to her supervisor, saying "I can help out."

28. Plaintiff's supervisor immediately responded (within a minute of Plaintiff's text) that "I sent your letter to HR. And I'll have to do a round of re training with you before you can work solo but I'll keep you posted, ma'am. :)"

29. Plaintiff texted her supervisor on October 18, 2018 asking "have you heard anything yet"? Plaintiff's supervisor did not respond to this text.

30. Plaintiff attempted to call her supervisor on October 20, 2017. Plaintiff's supervisor did not pick up the phone but instead texted Plaintiff "Hey girl. I'm on vacation. I'll call you soon. :)"

31. Plaintiff sent text messages to her supervisor on Monday, October 23, 2017, Tuesday October 24, 2017 and

32.     On Wednesday October 25, 2017, Plaintiff texted her supervisor "My credit[o]rs are wondering when I'm going back to work. Have you heard anything yet."

33.     When Plaintiff's supervisor again did not respond, Plaintiff texted again more than six hours later, asking "could you call me please."

34.     Plaintiff's supervisor responded by text message "Yes. I'll call you tomorrow. I haven't bee in town for 2 full weeks. I got all the data from HR yesterday about your re-hire. Talk tomorrow."

35.     Plaintiff's supervisor did not call or otherwise communicate with Plaintiff the next day. Therefore, on Friday, October 27, 2017, sixteen days after she had presented Defendant with a letter from her doctor stating that Plaintiff was able to return to work, Plaintiff texted her supervisor "Are you busy?" The time of this text was 11:53 a.m.

36.     Plaintiff's supervisor responded by text message at 11:55 a.m., stating "Yes. I'm so sorry. I've been in nurse practitioner interviews. I'm so sorry Lisa. It's been a roller coaster of a month. I have been in communication with HR and since you were gone for so long the system terminated your employment. Stephanie is our HR director has [sic] told me since you had disciplinary actions we can't re-hire you. /:"

37.     Plaintiff asked about Plaintiff's stethoscope, which was Plaintiff's personal property, and Plaintiff's supervisor responded "I'll get it for you. I am really sorry, Lisa. I hope you're feeling well and I will mail it to you. What is your mailing address."

38.     Plaintiff provided her mailing address, but Defendant never had anyone mail (or otherwise deliver to Plaintiff) her stethoscope.

39.     Defendant later asserted that Defendant terminated Plaintiff on or around September 7, 2017.

40. Upon information and belief, after informing Plaintiff that her job was fine throughout her leave, Defendant made a decision after October 11, 2017 (when Plaintiff had provided a letter to Defendant that Plaintiff was ready to return to work) to terminate Plaintiff's employment, deciding to provide as its "explanation" that "since you were gone for so long the system terminated your employment." Accordingly, after accommodating Plaintiff's reasonable request for accommodation in the form of unpaid medical leave until October 11, 2017 without undue hardship from doing so, and when Plaintiff no longer needed accommodation, Defendant terminated Plaintiff based on a perception that she was at that time disabled, or in retaliation for her previous exercise of her right to request a reasonable accommodation of her disability.

41. In the alternative, if Defendant made its decision to terminate Plaintiff on September 7, 2017, it did so without attempting to engage in an interactive process with Plaintiff regarding whether her request for accommodation in the form of unpaid medical leave was reasonable (it was) and without any analysis of whether such accommodation would be an undue hardship on Plaintiff (it would not have been). Indeed, Defendant's own characterization of the September 7, 2017 process was that "the system terminated your employment," by which Defendant's supervisor meant, upon information, that a computer program and not any human being made the decision (with no information from Plaintiff about her medical condition or anticipated date of return, none of which Defendant had requested) to not accommodate Plaintiff's request for unpaid medical leave from September 7, 2017 until she was able to return to work (which occurred October 11, 2017) and to instead terminate her employment.

42. Defendant's termination of Plaintiff has caused Plaintiff damages, including lost wages and emotional distress.

43. Plaintiff filed her claims with the EEOC, which issued a notice of right to sue which was received by Plaintiff within 90 days of the filing of this action.

## Claims and Causes of Action

### Count I – Violation of ADA by Failure to Accommodate Disability

44. Plaintiff re-alleges all allegations contained in the Paragraphs above as if fully set forth herein.

45. Plaintiff was a qualified individual with a disability under ADA.

46. The Defendant's actions constitute an unlawful failure to reasonably accommodate Plaintiff's disability under the ADA.

47. As a result of Defendant's actions, Plaintiff has suffered damages recoverable under the ADA.

### Count II – Violation of ADA By Failure to Engage in Interactive Process

48. Plaintiff re-alleges all allegations contained in the Paragraphs above as if fully set forth herein.

49. Plaintiff was a qualified individual with a disability under the ADA.

50. Plaintiff made a request for an accommodation of her disability, but Defendant failed to engage in an interactive process with Plaintiff to determine whether Plaintiff's requested accommodation or another reasonable accommodation could be accommodated without undue hardship to Defendant.

51. As a result of Defendant's actions, Plaintiff has suffered damages recoverable under the ADA.

### Count III – Violation of ADA by Discrimination and Unlawful Discharge on the Basis of Disability or a Perceived Disability.

52. Plaintiff re-alleges all allegations in the Paragraphs above as if fully set forth herein.

53. Defendant's actions constitute discriminatory and unlawful discharge on the basis of Defendant's perception after Plaintiff was ready to return to work that Plaintiff was disabled.

54. As a result of Defendant's actions, Plaintiff has suffered damages recoverable under the ADA.

### Count IV – Violation of ADA By Termination of Plaintiff in Retaliation for Plaintiff's Protected Exercise of Plaintiff's Right to Request Accommodation of Plaintiff's Disability

55. Plaintiff re-alleges all allegations in the Paragraphs above as if fully set forth herein.

56. Defendant terminated Plaintiff in retaliation for Plaintiff's exercise of her right under the ADA to request a reasonable accommodation of her disability in the form of unpaid medial leave.

57. As a result of Defendant's actions, Plaintiff has suffered damages recoverable under the ADA.

### Prayer for Relief

Wherefore, Plaintiff Lisa Moten respectfully prays that Plaintiff be awarded the following relief and all other relief to which Plaintiff may be entitled:

A. Trial by jury;

B. Judgment against the Defendant on all claims asserted herein;

C. Compensatory damages including but not limited to past and future wages and past and future lost benefits;

D. Compensatory damages including but not limited to emotional distress, mental anguish, humiliation and embarrassment;

E. Punitive damages to punish and deter similar future unlawful conduct;

F. An award of statutory attorney fees, costs and expenses;

G. Statutory interest on all damage awards, verdicts or judgments; and

  H. Any other relief to which Plaintiff may be entitled, or which the Court otherwise deems appropriate.

            Respectfully submitted,

            /s/ Mark N. Foster
            Mark N. Foster
            Law Office of Mark N. Foster, PLLC
            P.O. Box 869
            Madisonville, KY 42431
            (270) 213-1303
            MFoster@MarkNFoster.com
            *Counsel for Plaintiff Lisa Moten*